## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| WATERSHED VENTURES LLC d/b/a CRAVEABLE HOSPITALITY GROUP, LLC, KNC HOSPITALITY LLC, and JEFFREY CITRON, <br><br> Plaintiffs, <br><br> -against- <br><br> PRESERVE PROPERTY MANAGEMENT COMPANY, LLC d/b/a PRESERVE SPORTING CLUB & RESORT, <br><br> Defendants. | Docket No. 1:25−cv−00664−MSM−AEM |

## FIRST AMENDED COMPLAINT

Plaintiffs Watershed Ventures LLC d/b/a Craveable Hospitality Group, LLC ("**CHG**"), KNC Hospitality LLC ("**KNC**"), and Jeffrey Citron (collectively "**Plaintiffs**"), by and through their attorneys, Pierce Atwood LLP, as and for their first amended complaint (the "**Complaint**") against Defendant Preserve Property Management Company, LLC d/b/a Preserve Sporting Club & Resort (the "**Preserve**"), allege as follows:

### Nature of the Action

1.      This is an action for tortious interference with contract based on the Preserve's deliberate and malicious interference with Plaintiffs' rights under a settlement agreement (the "**Settlement Agreement**") that Plaintiffs entered into with celebrity chef David Burke when they and Chef Burke ended their joint venture in 2018.  In the Settlement Agreement, Chef Burke granted Plaintiffs a long-term license to use his name for a steakhouse called David Burke Prime that Plaintiffs have owned and operated at Foxwoods Resort Casino ("**Foxwoods**") in Ledyard, Connecticut for 17 years.

2.     When Chef Burke granted this license, he agreed that he would not allow his name to be used for any restaurant located within 25 miles of Foxwoods.  The parties included this geographical restriction in the Settlement Agreement because they knew that it would be highly damaging to David Burke Prime to have another Burke-branded restaurant in its nearby vicinity.

3.     Though the terms of the Settlement Agreement are unambiguous, and though the Preserve was, upon information and belief, aware of them, the Preserve, in tandem with Chef Burke, opened a Burke-branded restaurant, called Double Barrel Steak by David Burke ("**Double Barrel**"), at the Preserve, which is just 19 miles from David Burke Prime.  The Preserve/Chef Burke went out of their way to make their new Burke restaurant as much like David Burke Prime as possible, and they undertook an extensive advertising campaign for the new Burke restaurant, one that targeted David Burke Prime's potential customer base and even microtargeted people physically present at Foxwoods and David Burke Prime itself.

4.     As the parties anticipated, it has been extremely damaging to David Burke Prime to have a highly similar, aggressively marketed, Burke-branded restaurant in its veritable backyard.  After many years of consistent profitability and impressive growth, David Burke Prime suffered a precipitous drop in its financial performance contemporaneously with Double Barrel's opening.  Given Double Barrel's continued existence and close proximity to David Burke Prime, the injuries Plaintiffs are suffering are ongoing, with damages likely to exceed $10 million.

**Parties**

5.     Plaintiff CHG is a limited liability company formed under the laws of the State of Delaware.

6.      Plaintiff KNC is a limited liability company formed under the laws of Delaware.

7.      Plaintiff Jeffrey Citron is a natural person residing in Florida.

8.      Defendant the Preserve is a limited liability company formed under the laws of Rhode Island and its principal place of business is in Richmond, Rhode Island.

## Jurisdiction and Venue

9.      This Court has personal jurisdiction over the Preserve because it is formed under the laws of Rhode Island and has its principal place of business in Rhode Island.  Venue is proper pursuant to 28 U.S.C. §§ 1391(a)(1) and (2) because the Preserve resides in this district and because a substantial part of the events giving rise to this action occurred in this district. Diversity jurisdiction exists pursuant to 28 U.S.C. § 1332 because each Plaintiff and the Preserve are citizens of different states, and the amount in controversy exceeds $75,000.

## Factual Background

### *The Formation and Breakup of Plaintiffs' Joint Venture with Chef Burke*

10.      This dispute traces back to August 2008, when non-party KEC Holdings, LLC ("**KEC**") and Chef Burke formed a joint venture, *i.e.*, Plaintiff CHG.  KEC was an investment fund owned by Plaintiff Jeffrey Citron, a wealthy entrepreneur, and his wife, Suzanne Citron. (The Citrons later transferred their ownership interest in David Burke Prime to Plaintiff KNC, which they also own.)

11.      The purpose of the parties' joint venture was to commercialize, through CHG, the David Burke brand in the food and beverage industry (the "**F&B Industry**").  The joint venture would own and operate the David Burke restaurants and other Burke businesses that existed when it was formed and open new ones.  The parties' expectation was that the commercialization of the Burke brand in the F&B Industry would be done exclusively through CHG (except for a

few specified exceptions), and they agreed that Chef Burke would not engage in any commercial activity in the F&B Industry outside of CHG without KEC's consent.

12.    When the joint venture was formed, KEC contributed $5 million in start-up capital and also lent Chef Burke $600,000 pursuant to the terms of a promissory note.  As their capital contribution, Chef Burke and an entity he controlled, DB Global, LLC ("**DB Global**"), transferred to CHG all their interests in their existing restaurants and other businesses, and all rights necessary to commercialize the Burke brand in the F&B Industry.

13.    KEC and Chef Burke/DB Global split the ownership of CHG evenly.  They agreed that Chef Burke would serve as the joint venture's initial managing member and CEO, for which he would receive a salary.

14.    David Burke Prime was one of the restaurants that Chef Burke/DB Global transferred to CHG when it was formed.  After taking ownership of David Burke Prime, CHG spent approximately $9 million on a massive redesign and build-out of the restaurant's physical space, creating a large dining room and bar area with seating for 375.  $2 million of this was paid for with a portion of KEC's capital contribution, and Foxwoods financed the rest—loans that CHG repaid by paying additional rent.

15.    One of David Burke Prime's key distinguishing features has for many years been the unique dry-aging process (the "**Patented Aging Process**"), involving blocks of Himalayan sea salt, that it uses for aging beef, a process that Chef Burke and CHG staff developed and patented.  The Patented Aging Process has long been a key aspect of David Burke Prime's brand and marketing – it is, in fact, so central to David Burke Prime's identity that CHG centered its redesign of David Burke Prime's physical space around it.  CHG built an on-site aging room near David Burke Prime's kitchen that guests can visit, the walls of which are blocks of

Himalayan sea salt, and it chose, as the signature element of the redesigned dining room/bar area, illuminated blocks of Himalayan sea salt interspersed throughout the entire space.

16.     For the first few years after the joint venture was formed, Chef Burke was responsible for supervising the operations of its restaurants, including David Burke Prime.  By 2011, however, it had become clear that management was not Chef Burke's forte and that he preferred to focus on making promotional appearances.  He and Mr. Citron decided to hire an experienced restaurant management specialist to take charge of the management of the joint venture's restaurants.

17.     Chef Burke handpicked the person to fill this role – Stephen Goglia, a graduate of the Culinary Institute of America and veteran of the F&B Industry with extensive experience in all aspects of restaurant management.  In 2011, Mr. Goglia began serving as CHG's COO, in which role he was responsible for the management of all the joint venture's restaurants, including David Burke Prime.  Chef Burke and Mr. Citron promoted Mr. Goglia to President in 2012 and to CEO in 2013.  All the while, Chef Burke remained CHG's managing member.

18.     After arriving at CHG, Mr. Goglia assembled a team of restaurant management professionals that he led and that was responsible for managing the day-to-day operations of its restaurants.  Mr. Goglia implemented several key strategies to improve the quality and profitability of the restaurants, including increasing management and chef staffing, developing a world-class training program for staff, and taking several steps designed to reduce turnover, which had been high when Chef Burke oversaw management.  Mr. Goglia achieved a much lower turnover rate by, among other things, fostering a culture of respect and fairness at the restaurants, reducing the work week from six days to five, and implementing a meaningful bonus program that was driven by team-based performance metrics.

19.     Recognizing David Burke Prime's great potential, Mr. Goglia established a robust front-of-house management team for it that includes a Director of Operations, an Assistant General Manager, and four support managers; a culinary leadership team that includes an Executive Chef, an Executive Sous Chef, and three additional Sous Chefs; and leaders of server teams who provide daily support and oversight.  He also hired a financial analyst who would office at David Burke Prime and study its performance, in costs and sales, to unlock hidden value, as well as a Services Standard Manager to ensure that front-of-house operational standards were being supported, met, and enhanced.

***While CHG Invests Heavily in David Burke Prime and Its Other Burke-Branded Restaurants, Chef Burke Secretly Schemes to Leave CHG and Steal All Its Businesses, David Burke Prime in Particular***

20.     While Mr. Goglia was bringing his management expertise to bear on the joint venture's restaurants, Chef Burke, in early 2014, started secretly scheming with one of CHG's business partners, a Chicago-based real estate developer named Musa Tadros.  CHG had partnered with Mr. Tadros to open two new Burke restaurants in Tadros-owned spaces in Chicago and had spent considerable amounts of time and money developing the restaurants.  At a certain point, however, unbeknownst to Mr. Citron or Mr. Goglia, Chef Burke and Mr. Tadros decided to cut CHG out of the project and instead open the Chicago restaurants through a new venture that they would form and co-own.  Their plan was actually far broader, as later became apparent – their intent was to take not just the planned Chicago restaurants, but all CHG's existing and potential business for their new venture.

21.     In May 2014, when Chef Burke and Mr. Tadros were set to launch their new venture, Chef Burke abruptly announced that he was resigning as managing member of CHG and demanded that it stop using his name for any of its restaurants.

22.     The contracts through which the joint venture was formed (the "**Formation Documents**") contemplated the possibility that Chef Burke might one day stop participating in CHG's day-to-day operations.  In that event, the Formation Documents provided that Chef Burke/DB Global would retain their ownership interest in CHG but would lose the voting rights that had previously accompanied it.  In accordance with the Formation Documents, therefore, KEC appointed a new managing member of CHG (Mr. Citron), and CHG, believing that Chef Burke had conveyed the right to use his name to the joint venture, continued to operate its Burke restaurants, including David Burke Prime, under the management of Mr. Goglia and his team.

23.     After Chef Burke resigned as managing member, CHG carried out an investigation of his conduct as such.  It learned that, apart from his Tadros scheme, Chef Burke had habitually abused his duties as managing member by, for example, diverting business opportunities to himself, such as making personal appearances or selling Burke-branded merchandise, so he would not have to share the money with CHG.

24.     The Tadros/Burke partnership turned out to be a bust.  Lacking any true managerial structure, they were unable to open either of the Chicago restaurants.  Nor were they able to attract any of CHG's business to their new venture.  Mr. Goglia had by this time developed excellent relationships with CHG's business partners, and the goodwill that he had created among them allowed CHG to preserve its business relationships despite Chef Burke's attacks.  As for Chef Burke and Mr. Tadros, they had disbanded by the end of 2014.

***CHG Commences Legal Action Against Chef Burke/DB Global and Mr. Tadros***

25.     In 2015, CHG and KEC filed a lawsuit (the "**First Burke Litigation**") against Chef Burke in New York State Court.  Their complaint included claims for fraud, breach of the Formation Documents, and breach of fiduciary duty.  It was based on Chef Burke's scheme with

Mr. Tadros and the pervasive pattern of self-dealing he had engaged in as managing member. It sought monetary damages, as well as repayment of Mr. Citron's $600,000 personal loan to Chef Burke, which Chef Burke had failed to repay. The complaint also requested a declaratory judgement to the effect that CHG controlled the right to use the Burke name in the F&B Industry, given that such right was transferred to the joint venture when it was formed. Chef Burke responded by denying any wrongdoing and seeking a declaration that he controlled the right to use the Burke name in the F&B Industry.

26.    In 2016, CHG commenced an American Arbitration Association arbitration (the "**Arbitration**") against Mr. Tadros in which it claimed that Mr. Tadros had breached his contractual and fiduciary duties to CHG (Mr. Tadros owed fiduciary duties to CHG because they had formed joint ventures to pursue the planned restaurants in Chicago) by engaging in his scheme with Chef Burke.

***CHG Obtains a $2 Million Award in the Arbitration and Settles the First Burke Litigation***

27.    The Arbitration ended in January 2018 following five days of hearings in Chicago. The presiding arbitrator issued a written decision in which she found that Mr. Tadros had breached his contractual and fiduciary duties to CHG by engaging in the scheme with Chef Burke. *See* Exhibit 1 pp. 7-9. She ordered Mr. Tadros to pay CHG approximately $2 million, finding that Mr. Tadros had not only breached his obligations to CHG but had also "engaged in extensive efforts to conceal his activities from" CHG and "deceived Mr. Goglia." *See id.* pp. 9, 11.

28.    In July 2018, Plaintiffs and Chef Burke entered into the Settlement Agreement, thereby consensually resolving the First Burke Litigation. Under the terms of the Settlement Agreement, Chef Burke/DB Global relinquished their 50% ownership interest in CHG for no

monetary consideration and agreed to repay a portion of the personal loan. *See* Exhibit 2 §§ 9, 12. The parties also reached agreement on the use of Chef Burke's name in the F&B Industry. They agreed that Plaintiffs could continue to use Chef Burke's name for each of the Burke restaurants that then existed (the "**Existing Burke Restaurants**"), but that they would not open any new Burke-branded restaurants. *See id.* §§ 3(a)(i)-3(a)(iii), 3(c). The Settlement Agreement identified each of the Existing Burke Restaurants. David Burke Prime is one of them. *See id.* § 3(a).

29.    To effectuate the parties' intent, Chef Burke/DB Global granted Plaintiffs a license to use Chef Burke's name for each of the Existing Burke Restaurants for as long as it continued to operate at the same location under the same name. *See id.* § 3(a). The parties agreed this license would initially be for a "[r]oyalty-[f]ree [p]eriod," after which Plaintiffs would be required to pay a royalty for using Chef Burke's name. *See id.* §§ 3(a)(i)-3(a)(iii). This royalty-free period varied from one Existing Burke Restaurant to another – for David Burke Prime, the royalty-free period is 15 years from the execution of the Settlement Agreement. *See id.*

30.    The parties also agreed that Chef Burke/DB Global could use Chef Burke's name for new Burke-branded restaurants, subject to certain restrictions. Chef Burke/DB Global agreed, first, that they would not allow Chef Burke's name to be used for any restaurant with a name that is confusingly like one of the Existing Burke Restaurants. *See id.* § 3(e)(ii).

31.    Chef Burke/DB Global also agreed that they would not allow his name to be used for any restaurant located nearby an Existing Burke Restaurant. *See id.* § 3(i). The Settlement Agreement specified a restricted zone around each Existing Burke Restaurant within which Chef Burke/DB Global would not open a new Burke restaurant. *See id.* §§ 3(i)(i)-3(i)(v). With

respect to David Burke Prime, Chef Burke/DB Global agreed that they would not open any restaurant that uses Chef Burke's name, or "grant[] any non-party to [the Settlement Agreement]…any right to use" his name for a restaurant, that is located "within twenty-five miles of" Foxwoods.  *See id.* §§ 3(i)(i), 3(i)(v).

32.     The parties also reached an agreement concerning the use of the Patented Aging Process.  The patent is in Chef Burke's name, but CHG regarded it as a work for hire.  The parties agreed each could make mutual use of the Patented Aging Process.  *See id.* § 5.

***The Preserve Contracts with Chef Burke to Open a Burke-Branded Restaurant 19 Miles from Foxwoods***

33.     Though Plaintiffs did not know it at the time, Chef Burke, in late 2022, agreed to partner with the Preserve to open a "signature" David Burke restaurant in the Preserve's large main dining room.  The Preserve is a luxury resort that is located in Richmond, Rhode Island and is owned by a businessman named Paul Mihailides.  It bills itself as a "sports" resort and offers its guests and members various outdoor activities such as tennis and golf with an emphasis on gun-related activities such as hunting, skeet shooting, and shooting ranges.  It offers overnight accommodations, residences for sale, and dining in several different locations, as well as room service.  Its main dining room is a large room with a seated bar area, with a seating capacity of 350.  Before it went into business with Chef Burke, the Preserve had been operating a restaurant in the main dining room called Double Barrel Kitchen, invoking the gun-themed nature of the resort.

34.     The Preserve is 19 miles from Foxwoods.  It is extremely close to I-95, 1.2 miles from the I-95 ramp north toward Providence and 1.5 miles from the I-95 ramp south toward Westerly in Richmond, Rhode Island.

35.     Mr. Mihailides and Chef Burke had been friends for many years.  Chef Burke was a member of the Preserve and sat on its Board of Directors, and he had visited the Preserve frequently.

36.     In late 2022, Chef Burke and Mr. Mihailides began to discuss an arrangement in which the Preserve's food and beverage operations ("**FBO**") would be turned over to Chef Burke and his restaurant management company, David Burke Hospitality Management LLC ("**DBHM**"), to operate. On information and belief, Chef Burke and DBHM executed a fifteen-year contract with the Preserve in or around December 2022 memorializing this intent.

37.     Mr. Mihailides was well aware of David Burke Prime and its proximity to the Preserve when he executed the agreement between the Preserve and DBHM dated December 15, 2022 (the "**Preserve Agreement**") on the Preserve's behalf.  He was also, as the result of his long relationship with Chef Burke, aware that Plaintiffs owned and operated David Burke Prime, that Chef Burke and Plaintiffs had litigated against each other, and that they had resolved their litigation.  He was also, upon information and belief, aware of the Settlement Agreement and the geographical restrictions contained in it, having learned about them either during the due diligence that preceded the execution of the Settlement Agreement and/or as a result of his long relationship with Chef Burke.

*The Preserve/Chef Burke Open Double Barrel*

38.     Starting in late 2022, Chef Burke, his colleagues at DBHM, and his professional marketing consultants worked with the Preserve to prepare to open the new Burke restaurant at the Preserve.  They chose a name that emphasized Chef Burke's involvement, and they chose to make it a steakhouse, just like the Burke-branded restaurant they knew was a short drive away.

*See* Exhibit 3 pp. 1-2.  They also chose a logo for the new restaurant.  It too emphasized Chef

Burke's connection with the restaurant:



39.    As part of their preparations, Burke/the Preserve undertook a major redesign of

the large dining room in which the new restaurant would be located.  They chose to make the

Patented Aging Process the anchor theme of Double Barrel's dining room/bar area, just like

David Burke Prime.  Indeed, they chose the exact same signature design element as David Burke

Prime – the decorative interspersal of illuminated Himalayan salt bricks into the walls

throughout the restaurant.  To add another design touch emphasizing Chef Burke's involvement

with the restaurant, they placed large statuettes of red horses, a Burke trademark, throughout the

dining room.

40.    Among their many other preparatory steps, Chef Burke and the Preserve created a

website for the new restaurant, as well as insets for the Preserve's and Chef Burke's websites.

The website material emphasized Chef Burke's name and likeness, his association with the

restaurant, and the Patented Aging Process.  *See, e.g.,* Exhibit 4 at PLTFS 2-3; *see* Exhibit 5 at

PLTFS 46; *see* Exhibit 6; *see* Exhibit 7.  They also chose a URL, email address, and Twitter

username that that all referred to Chef Burke by his initials – doublebarrelsteakbydb.com,

hello@doublebarrelsteakbydb.com, and @doublebarrelsteakbydb.com.  *See* Exhibit 6 p. 6; *see* Exhibit 8; *see* Exhibit 9; *see* Exhibit 10.

41.    The Preserve and Chef Burke also designed menus for the new restaurant.  The menus featured Chef Burke's name prominently and featured many of his signature dishes, such as Clothesline Bacon, DB Signature Cheesecake Lollipops, and "Not So Humble" Key Lime Pie, dishes that are offered only at Burke-branded restaurants.  *See* Exhibit 8 pp. 1-2; *see* Exhibit 9; *see* Exhibit 10.  The menu referred to Chef Burke by his initials in multiple places, such as in offering the restaurant's DB "Salt Aged" Beef, DB Burger, and DB Signature BLT.  It also promoted the Patented Aging Process, referring to the patent as belonging to Chef Burke and even identifying it by number.  *See id.*

42.    By New Year's Eve 2022, Chef Burke and the Preserve were far enough along in their preparations to offer a David Burke-themed New Year's Eve dinner in the Preserve's main dining room.  The menu for this dinner featured many signature Burke items, cocktail napkins with Chef Burke's name, Burke-branded swag for its guests, and flowers and linens chosen to align with the colors of the logo.  On information and belief, Chef Burke attended the New Year's Eve dinner (*see* Exhibit 11 at Response to Request No. 31 and Exhibit A) and greeted the guests.

43.    In early March 2023, Double Barrel Steak by David Burke formally opened, with a ribbon-cutting ceremony featuring Chef Burke and Mr. Mihailides.

### The Preserve/Burke's Media Blitz for Double Barrel

44.    With the help of at least three outside professional marketing agencies as well as the Preserve's in-house marketing department, the Preserve/Burke carried out a large-scale, sophisticated marketing campaign for Double Barrel when it opened.  They focused on the local

market, heavily promoting the new restaurant in the area surrounding Double Barrel, *i.e.*, the heart of David Burke Prime's customer base.

45.     One of the advertising agencies they hired, The Zimmerman Agency LLC ("**Zimmerman**"), arranged for a local television station, WPRI-TV, the Rhode Island CBS affiliate, to send a reporter and camera team to film the Burke/Mihailides ribbon cutting ceremony at Double Barrel.  *See* Exhibit 12 p. 1.  When WPRI-TV aired a clip from the ribbon cutting ceremony that night, it reached approximately 38,000 local viewers, according to Zimmerman.  *See id.*  The clip reached an additional 96,000 viewers when Zimmerman secured coverage on the @RhodeIslandRestaurants and @WhatsGoingOnInRhodeIsland Instagram pages.  *See id.*

46.     Around the same time, the Preserve/Burke placed advertisements for the restaurant on local television and radio stations, as well as satellite radio, with all the advertisements highlighting Chef Burke's close association with the restaurant, and the Patented Aging Process.  They also drafted a press release announcing Double Barrel's opening and arranged for it to distributed on the U.S. national wire.  As well, their marketing team reached millions of potential guests by placing stories about the new restaurant in leading regional publications, including the Boston Globe, the Providence Journal, Rhode Island Monthly, and the Hartford Courant, as well as national publications such as Food & Beverage Magazine.

47.     The Preserve/Burke marketing team also heavily promoted the new restaurant on YouTube and social media, including by posting repeatedly about it on the Facebook and Instagram accounts of the Preserve, Chef Burke, and Double Barrel.  These accounts, the Burke/Preserve marketing team estimated, had millions of followers.  The Preserve/Burke reached countless additional potential guests by advertising the restaurant on all the major

restaurant review websites, including Yelp, OpenTable, Wine Spectator, Tripadvisor, and MenuPix, always emphasizing Chef Burke's ties to Double Barrel and its Patented Aging Process.

48.     The Preserve/Burke had David Burke Prime in mind when they crafted their marketing strategy.  They decided to use geotargeting to send advertisements for Double Barrel directly to people physically present at Foxwoods and David Burke Prime.

***Double Barrel Attracts Many Guests but Is Hampered by Dysfunctional Management; As Double Barrel Falls into Disarray, DBHM Posts Fake Reviews of Burke Restaurants Online***

49.     Soon into Double Barrel's existence, the Preserve was already lodging complaints about the quality of DBHM's management.  On March 9, 2023, the Preserve's COO, Phil Santomaro, sent Chef Burke and DBHM's managing partner, Carmine Di Giovanni, a memorandum with 27 bullet points of managerial deficiencies that "ownership, members, local diners, and staff members" had observed.  Exhibit 13 p. 2.  His list included items such as "only good pre shifts were when DB was giving them himself," "[l]ong wait times for main course," "[l]ong waits on breakfast orders," "[s]ervice is slow," "[m]anager missing on floor," and "[f]loor needs to be cleaned" better.  *Id.*  When he sent the memorandum, Mr. Santomaro noted that the Preserve and DBHM were not "separate islands" and would need to work together to be successful.  *Id.* p. 1.

50.     Double Barrel's management problems were soon detrimentally impacting the customer experience it provided.  On March 25, 2023, a reviewer wrote that his "[w]aiter was horrible" and the "manager was useless" and called his meal an "overall horrible experience." Exhibit 14 at PLTFS 8145-8146.  Another guest sent the Preserve and Double Barrel an email on April 19, 2023, lambasting Double Barrel's terrible service, saying that he and his friend had been served radishes that were "unwashed[] and rotten," the "service was painfully slow,"

"[e]ntrees were served cold to the touch yet somehow overcooked," and the restaurant served what was really just ketchup as cocktail sauce. Exhibit 15 at DB 2115. On their way home from Double Barrel, the email's author's friend asked, "Do you think anyone in that building has worked in a restaurant before?" *Id.* at DB 2116.

51.    By May 2023, Mr. Santomaro's frustration with DBHM's management was growing. On May 16, 2023, he sent Mr. Di Giovanni a lengthy email providing "insight to [his] frustrations." Exhibit 16 p. 1. Among his many complaints, he told Mr. Di Giovanni that he had learned the prior day at noon that the restaurant had run out of two of the most popular items on the menu, the bone-in filet and the bone-in ribeye. *Id.*

52.    This was a serious problem, Mr. Santomaro wrote, because the restaurant's professional supplier could not provide same day delivery and Double Barrel had dinner reservations for 50 that night as part of a joint event with Bentley Motors Limited, the luxury car and SUV manufacturer. *Id.* Mr. Santomaro wrote that they could not afford to lose face with Bentley and their guests by "86[ing] bone in filets and bone in ribeyes." *Id.* So, Mr. Santomaro wrote, he drove to the closest Whole Foods Market to buy enough product for the night. *See id.* Because Whole Foods only had boneless ribeye and filets, Mr. Santomaro bought that, and it was substituted in for the bone-in product described on the menu. *See id.* Mr. Santomaro closed his email by noting that Double Barrel needed a manager "that can think on their feet," and was understaffed for the upcoming Memorial Day weekend. *Id.*

53.    As time went on, the Preserve's frustration with DBHM's management intensified. On June 8, 2023, Mr. Santomaro sent Mr. Di Giovanni and Mr. Lieberman an email in which he complained that they had provided a supposedly current inventory of the kitchen that

was "a 99% replica of the month prior."  Exhibit 17 p. 1.  Mr. Santomaro described this as a "total 'Go Fuck Yourself,'" "unacceptable" and "disrespectful."  *Id.*

54.     In this same time frame, the Preserve decided that Double Barrel's management problems – and in particular the training of its staff – were so serious that it would have to hire a management consultant, Brian Crawford, to become Double Barrel's Director of Training, a role in which his focus was on training and overseeing the existing managers, culinary team, and front-of-house staff.  *See* Exhibit 18 pp. 1-3.  After meeting with Mr. Crawford in the Double Barrel dining room to discuss the possibility of him taking the job, Mr. Santomaro, on June 7, 2023, wrote to thank Mr. Crawford for the meeting.  *See* Exhibit 19 p. 1.

55.     He told Mr. Crawford that he "really enjoyed our conversation" but was "completely embarrassed re: the service in the restaurant," which was particularly egregious, Mr. Santomaro noted, because the staff knew he is a "VIP."  *Id.*  The "silver lining," Mr. Santomaro wrote, was that "you got a glimpse of what is not working."  *Id.*

56.     Despite Mr. Crawford's hiring, the problems at Double Barrel continued.  On July 5, 2023, Mr. Lieberman sent Chef Burke and Mr. Santomaro an email recounting how Mr. Mihailides had, earlier that day, screamed at him, called him a "liar," and then fired him, while they were in the Double Barrel dining room, with guests present and "[i]n front of the entire staff."  *See* Exhibit 20 pp. 1-2.  Mr. Lieberman called Double Barrel's environment "toxic," and observed that Mr. Mihailides's "bullying[] and aggressive way" with staff was "not acceptable." *Id.* p. 2.  The "proof" of that, Mr. Lieberman wrote, "is in the 7 managers that have quit in the past 5 months."  *Id.*

57.     As the internal chaos at Double Barrel continued, it became increasingly observable to Double Barrel's guests.  On June 25, 2023, for example, a guest who had

celebrated their birthday with a meal at Double Barrel, wrote in a review "I just want to say 'DON'T GO THERE'!!!" and elaborated that the "[s]ervice was horrible," it took "20 minutes" of being seated "before the waiter showed up," the "waiter would disappear" as the meal continued, and "my husband[']s steak was burned to a crisp and was like shoe leather." *See* Exhibit 21 at PLTFS 8137.  They called Double Barrel the "Worst restaurant ever" and advised potential guests of Double Barrel to "Stay away!"  *See id.*  A July 2023 reviewer likewise wrote that the "wait staff was rude," and the "steak was improperly cooked" – having "visited DB in many places," Double Barrel was the "most appalling dinner" the reviewer had had.  Exhibit 22 at PLTFS 8159.  While Double Barrel did receive some positive online reviews, how many were authentic is an open question to be addressed in discovery.  Faced with dreadful reviews from unhappy customers, the Preserve/Chef Burke, upon information and belief, started to post fake reviews from non-existent customers praising the high quality of meals at Double Barrel that were never had.

58.     Unfortunately for David Burke Prime, customers naturally came to associate it with Double Barrel, given their great similarity and proximity.  After all, both were Burke-branded, both were steakhouses, both had the Patented Aging Process as a core element of their identities, both had similar menus offering Burke signature items, and both were located in large dining rooms with the same highly distinctive signature décor element – the illuminated blocks of Himalayan sea salt in the walls.

59.     Believing the two restaurants were related, customers of David Burke Prime complained to its staff about bad experiences they had had at Double Barrel, some even asking David Burke Prime to comp them for problems they had had at Double Barrel.  Likewise, a Double Barrel reviewer referred to David Burke Prime as the "Foxwoods location" of Double

Barrel while commenting that her shrimp at Double Barrel were "turning brown" and had a "weird green tinge to them."  Exhibit 23 at PLTFS 8108-8109.  Another wrote that, though he "love[s]" David Burke Prime, Chef Burke "should take his name off of [Double Barrel] because it is ruining his reputation."  Exhibit 21 at PLTFS 8137-8138.

60.     As Double Barrel struggled with management problems, the Preserve and Mr. Mihailides were having troubles of their own.  They were hit with lawsuits from two women who had worked at the Preserve (one a 28-page federal court complaint) and accused Mr. Mihailides of egregious sexual misconduct in graphic detail.  They alleged that he habitually preyed on female employees of the Preserve, while the Preserve as an organization always looked the other way.

61.     The lawsuits were big news, particularly regionally.  They were covered by the Boston Globe, the Providence Journal, and the New York Post, as well as many other media outlets.  Given that the Preserve and Double Barrel were so closely connected with each other in the public domain, news of the lawsuits only compounded the public perception problems Double Barrel was already having because of its managerial incompetence.

62.     Despite the many problems, the Preserve/Burke were successful in attracting customers to Double Barrel.  Fueled by the Burke name and their marketing juggernaut, Double Barrel, on information and belief, began making significantly more revenue in the timeframe following its association with Chef Burke than it had in previous years.

***In August 2023, After CHG Sends a Cease-and-Desist Letter, Mr. Mihailides Tells Mr. Goglia That the Preserve Will Disassociate from Chef Burke; However, It Failed to Do So and Continues to Publicly Associate Double Barrel with Chef Burke***

63.     By July 2023, it was evident that Double Barrel's opening was causing serious problems for David Burke Prime.  Its revenue and profits dropped substantially, Foxwoods's

CEO had complained about seeing advertisements for Double Barrel on local television, and David Burke Prime's guests, incorrectly believing that David Burke Prime was associated with Double Barrel, were complaining about bad experiences at Double Barrel.  On July 5, 2023, CHG sent Chef Burke and DB Global a letter putting them on formal notice of their breach of contract and demanding that they stop allowing Chef Burke's name to be used in connection with the restaurant and eliminate any existing public associations between it and Chef Burke.

64.     Chef Burke refused to do so and, in September 2023, Plaintiffs commenced litigation (the "**Second Burke Litigation**") against him in New York for breach of the Settlement Agreement's 25-mile restricted zone.  In August 2023, Mr. Mihailides, having received a copy of the cease-and-desist letter from Chef Burke, called Mr. Goglia to tell him that the Preserve and Chef Burke were disassociating.  Mr. Mihailides followed with an email dated August 21, 2023, in which he told Mr. Goglia that the Preserve was "taking down all of the David Burke[']s name [etc.] in the restaurant," "a new menu will be in place…by the first of Sept.," the Preserve will make "[n]o reference to sea salt dry aged steak at all moving forward," and "[a]ll other references to Burke in the [D]ouble [B]arrel will be eliminated."  Exhibit 24 p. 1.

65.     Unfortunately, the Preserve/Burke never did as Mr. Mihailides said it would and, upon information and belief, never intended to.  Instead, they engaged in a cat-and-mouse game in which they tried to minimize their litigation exposure by dropping some public associations with Chef Burke while preserving the benefit of the Burke name by continuing other important public associations.

66.     For example, while Burke/the Preserve removed Chef Burke's name from the name of the restaurant in some places, Double Barrel's website continued, until at least September 2024, to show photographs of Chef Burke at Double Barrel and feature many articles

and reviews describing Double Barrel as a Burke restaurant.  *See* Exhibit 25 at PLTFS 6013-6019.  Similarly, the Preserve continued to identify Double Barrel as a David Burke restaurant on all the major food and travel websites until at least the beginning of 2024, and on at least one of them, Wine Spectator, as recently as February 2025.

67.     Likewise, though Mr. Mihailides promised that a "new menu" would be in place by the first of September 2023 (*see* Exhibit 24 p. 1), Double Barrel's menu remained Burke-centric.

68.     In April 2024, the Preserve produced, in response to a subpoena that Plaintiffs served on it as a nonparty in the Second Burke Litigation, what the Preserve referred to as Double Barrel's "After Burke" dinner menu (*see* Exhibit 26 p. 13).  Its "After Burke" menu identifies Chef Burke by his full name in multiple places, is oriented around his signature dishes, advertises his personal Twitter account (@chefdavidburke), and refers to him by his initials in many places, including in Double Barrel's URL (doublebarrelsteakebydb.com), the username of its Twitter account (@doublebarrelsteakbydb.com), and in its description of his signature dishes (*e.g.*, DB Burger).  *See id.*

69.     Moreover, although Mr. Mihailides specified in his email to Mr. Goglia that the Preserve would make no reference to "salt dry aged steak at all moving forward" (*see* Exhibit 24 p. 1), its "After Burke" menu offers "DB 'Salt Aged' Beef," featuring what it describes as "David Burke Himalayn Salt Aging."  *See* Exhibit 26 p. 13.  Despite Mr. Mihailides's promise that the Preserve would also "remove the patent reference" from its menus (*see* Exhibit 24 p. 1), the "After Burke" menu refers to the patent and identifies its patent number.  *See* Exhibit 26 p. 13.

70.     Even when the Preserve/Burke did make a change, they chose to change in a manner that would preserve the association with Chef Burke.  For example, when they ultimately

did change Double Barrel's URL and email address from "doublebarrelsteakbydb," they could have kept the "doublebarrelsteak" language and removed the reference to Chef Burke by his initials. Instead, they chose to drop the "doublebarrelsteak" part while keeping and emphasizing the "db" part, changing Double Barrel's URL and email address to "dbsteak," deliberately perpetuating the association with Chef Burke. *See, e.g.,* Exhibit 27 p. 6.

71. They are doing so in other ways as well, such as Double Barrel's website, which features – as the central image on its first page – a slow-motion video of one of Chef Burke's most famous signature dishes, Clothesline Bacon, a dish that is only served at Burke restaurants and with which Chef Burke is highly associated. *See* dbsteak.com. Indeed, in October 2024, the Preserve/Burke co-hosted a weekend event for the media at the Preserve capped off by dinner at Double Barrel with representatives of various media outlets, including Forbes and Outdoor Life. *See* Exhibit 28 at DB 5648-5649, 5656. Chef Burke created the menu for the dinner and it featured signature Burke dishes (*see id.* at DB 5648 and at DB 5660), including one that Mr. Mihailides specified, in his August 21, 2023 email to Stephen Goglia, Double Barrel would take off the menu because of its high association with Chef Burke. *See id.* at DB 5660; *see* Exhibit 24 p. 1.

72. Any conceivable doubt that the Preserve is continuing to foment the public perception that Double Barrel is a Burke restaurant would be dispelled by a visit to Double Barrel. As recently as May 2025, every person who enters Double Barrel:

(i) passes a sign that identifies the name of the restaurant as "Double Barrel Steak by DB" (*see* Exhibit 29);

(ii) enters a dining room whose décor is dominated by blocks of Himalayan sea salt and large red horses;

(iii)     sees bottles of David Burke barbeque sauce with his name and likeness on them at every table;

(iv)     chooses from a number of David Burke signature dishes on the menu, dishes that are only available at Burke restaurants and are referred to by Chef Burke's initials;

(v)     is, when ordering steak, provided with Burke-branded steak knives that bear his name and likeness and are only available at Burke restaurants; and

(vi)     has the option to buy Burke-branded pots, pans, tablemats, and other merchandise in Double Barrel's gift shop and other locations at the Preserve.

73.     The Preserve/Burke are clubbing Double Barrel's guests over the head with the impression that it is a Burke restaurant.  The only reasonable conclusion any visitor to Double Barrel can draw, as intended, is that Chef Burke is associated with it.

74.     The Preserve/Chef Burke know perfectly well what steps are necessary to disassociate – after all, they agreed that, if they ever truly did disassociate, they would, for example, remove all Burke signature items from the menu, never refer to a "derivative" of Chef Burk's name, and eliminate any feature of Double Barrel that is "confusingly similar" to a Burke restaurant.  Rather than doing that, the Preserve/Burke are purposely stoking the valuable public perception that Double Barrel is associated with Chef Burke.

75.     Mr. Santomaro put it well in an email he sent Mr. Burke in February 2024 – as opposed to disassociating, he assured Mr. Chef Burke that the Preserve was "trying hard to keep the Burke name alive and well in RI."  *See* Exhibit 30.

***While It Is Unclear to Plaintiffs Who Is Managing Double Barrel at Present, Its Problems and Deceptive Advertising Practices Continue***

76.     Though the Preserve is still clearly trying to capitalize on the Burke name, it is unclear to Plaintiffs whether DBHM is still managing Double Barrel.  The Preserve has suggested that DBHM stopped managing Double Barrel in August 2023, but neither Chef Burke/DB Global nor the Preserve produced any documents in the Second Burke Litigation suggesting that the Management Agreement was ever terminated, though the Management Agreement requires written notice to terminate.

77.     Moreover, Chef Burke/DB Global and the Preserve have produced documents evidencing DBHM's continued role in management long after August 2023, including in placing orders for the restaurant (*see, e.g.,* Exhibit 31, Exhibit 32, and Exhibit 33), hiring (*see, e.g.,* Exhibit 34), and reviewing kitchen function (*see* Exhibit 35).

78.     Regardless of who has been managing Double Barrel since August 2023, its severe problems have continued.  On September 24, 2023, for example, Mr. Santomaro told a DBHM employee that another one of Double Barrel's chefs had "walked out" and that it is "getting by best we can."  *See* Exhibit 31.  The next month Mr. Santomaro contacted Chef Burke to tell him that "We had to let Anthony go today, the sous chef."  Exhibit 36 p. 1.  He had, Mr. Santomaro explained, been "warned a few times for his outbursts, today go[t] to a point where I thought he was going to hurt someone."  *See id.*  Once again, he wrote that Double Barrel is "[d]oing the best we can."  *Id*

79.     The scathing on-line reviews, depicting a chaotic, troubled restaurant, also continued.  An October 5, 2024 reviewer, for example, wrote about witnessing an "angry" "boss" swear "at a server who allowed him to violate her personal space clearly out of fear" and then "grab[bed] her bag" and walked out.  *See* Exhibit 23 at PLTFS 8105-8106.  A February 13, 2024

reviewer recounted having an "uncomfortable experience" at Double Barrel when she witnessed six different parties walk out because of slow service – the manager's excuse was that an "enormous amount of staff walked off the job the day prior." *See id.* at PLTFS 8106.

80.    Other indicative post-August 2023 online reviews include:  November 9, 2023 – Double Barrel "may turn out to be a lemon" due to "staff incompetence" (*see* Exhibit 37 at PLTFS 8123); November 6, 2023 – "staff…were incredibly slow and inattentive" (*see* Exhibit 23 at PLTFS 8107-8108); December 10, 2023 – guest "had to get up from our table to request steak knives" (*see id.* at PLTFS 8106-8107); December 9, 2023 – guest "could hear the other customers complaining about the slow service" (*see* Exhibit 14 at PLTFS 8149); April 11, 2024 – "service was terrible" and "[n]ow we know never to go there again and we will advise others not to" (*see* Exhibit 21 at PLTFS 8133-8134); June 16, 2024 – "service was absolutely terrible," "the terrible service can't be understated," manager was "useless," and Double Barrel was "not worth the trip" (*see id.* at PLTFS 8133); August 24, 2024 – party of two was seated at table for six and "[t]he wait staff would just disappear for extended periods, where did they go?" (*see* Exhibit 14 at PLTFS 8147-8148); July 17, 2025 – "service was awful" (*see* Exhibit 38 pp. 6-7); July 19, 2025 – "no reason or excuse for such poor service[]" (*see id.* p. 6); August 16, 2025 – guest's "chair had crumbs on it…[w]e switched it ourselves," "never once saw a manager on the floor," and "server disappeared toward the end of the meal" (*see* Exhibit 39 pp. 9-10); and September 2025 – guest "won't go back" (*see* Exhibit 40 p. 1).

81.    Indeed, Double Barrel's management problems may be getting worse.  If DBHM is no longer managing Double Barrel, it is an open question whether the Preserve has even hired a professional restaurant management company to manage Double Barrel, or is trying to do so

itself.  A June 2025 reviewer observed that Double Barrel is deteriorating, writing that "[t]his place [has] go[ne] down a lot!"  *See id.*

82.    As Double Barrel's problems continue, so do its dishonest advertising practices.  Not only did the practice of posting fake reviews continue upon information and belief, but Double Barrel's website fraudulently touts a Wine Spectator award that Double Barrel won for 2025.  While Double Barrel claims on its website to have won a two-bottle award, in fact, it received the less prestigious, one-bottle award.  *Compare* Exhibit 41 p. 5 *with* Exhibit 42 p. 1.

***The Preserve's Tortious Interference with the Settlement Agreement Has Caused Significant, Ongoing Damage to David Burke Prime***

83.    The Preserve induced Chef Burke to breach his obligations under the Settlement Agreement when they joined forces to open Double Barrel 19 miles from Foxwoods.  The Settlement Agreement prohibits Chef Burke from, *inter alia*, "open[ing] any" restaurant that "use[s] the David Burke name" or "grant[ing] any non-party to [the Settlement Agreement]…any right to use" Chef Burke's name for any restaurant located within 25 miles of Foxwoods.  *See* Exhibit 2 §§ 3(i), 3(i)(i), and 3(i)(v).  The Preserve induced Chef Burke to do just that, however, when it contracted with him for the right to use his name for Double Barrel, and subsequently opened it at the Preserve just 19 miles from Foxwoods.

84.    The Preserve knowingly facilitated Chef Burke's breach of the Settlement Agreement, made it possible.  It was aware of the Settlement Agreement's geographical restriction before it entered into the Preserve Agreement, upon information and belief.  Undeniably, the Preserve was aware of the Settlement Agreement's geographical restriction by July or August 2023, at the latest, when it received Plaintiffs' cease-and-desist letter.  Though the Preserve knew that Chef Burke was breaching his contract by allowing his name to be used for

Double Barrel, the Preserve eagerly used his name for Double Barrel because that was in the Preserve's pecuniary interests.

***The Preserve's Tortious Interference with the Settlement Agreement Has Caused Significant, Ongoing Damage to David Burke Prime***

85.    Nor can there be any question that David Burke Prime has suffered material losses because of the Preserve's unlawful interference.  David Burke Prime has enjoyed a long track record of success under the management of Mr. Goglia and his team.[1]

86.    After Double Barrel's opening, however, David Burke Prime experienced a significant drop in profits, and the factual circumstances of this dispute (including the Preserve/Chef Burke's media campaigns heavily promoting Double Barrel, including to David Burk Prime's known customer base, the similarity and proximity of the two restaurants, the timing of the drop, and the fact that the management of David Burke Prime remained the same) strongly suggest that Double Barrel's opening was the primary cause for the decline.

87.    When all the relevant factors are considered, Double Barrel has inevitably drawn substantial numbers of potential guests away from David Burke Prime and will continue to do so for as long as it is open.  It has also significantly damaged David Burke Prime's brand.

88.    As the customer reviews discussed above reflect, it is inevitable that people associate the restaurants with each other, given the Burke connection and their other similarities and proximity.  Any negative impression that one forms of Double Barrel, therefore, inevitably

---

[1] As a result of Plaintiffs' strong, consistent management, under the leadership of Mr. Goglia, David Burke Prime has for many years been able to provide a consistent, high quality customer experience delivered at fair value to every guest.  This helps to explain why David Burke Prime is one of the highest ranked restaurants in its area with over 2,000 reviews on Google with a 4.5/5 star rating, as well as the winner of many prestigious accolades in the F&B Industry, including being named one of Connecticut's best restaurants in 2022 and 2023 by Connecticut Magazine's Readers' Choice, one of the best steakhouses in the US in 2025 by TastingTable.com, and one of the best steakhouses in Connecticut in 2023 and 2024 by LoveFood.com and TasteofHome.com.  Among its many other F&B Industry awards, David Burke Prime has won the Wine Spectator Best of Award of Excellence 10 years in a row.

redounds to the detriment of David Burke Prime.  At the same time, Double Barrel unfairly capitalizes on the goodwill that David Burke Prime has generated over the course of its long existence.  This is the situation that the Preserve's deliberate interference with Plaintiffs has created.

89.    That David Burke Prime has come to be associated with Double Barrel is painfully ironic.  David Burke Prime is an extraordinarily stable, well-run restaurant managed by a team of highly skilled restaurant management professionals with decades of experience in restaurant management and a track record, more than a decade long, of successfully managing David Burke Prime specifically.  They have created an environment in which the staff is highly trained and supported by robust management, there is little drama, and the turnover, particularly in key positions, is remarkably low (*e.g.*, its Executive Chef and Director of Operations have been at David Burke Prime since 2008 and 2015 respectively).

90.    As the discovery process will show, it is highly damaging to such a restaurant's brand to be associated with the shambolic house of disorder that is Double Barrel, a place with a "toxic" environment and lots of drama, where the service is "appalling," the staff untrained, and managers "useless," a place where staff quits on the spot in front of guests, a place where multiple groups of guests walk out in one sitting because of "slow service," a place where staff is humiliated and verbally abused by their bosses in front of guests, a place where people seem to be quitting or getting fired every day, a place where an "enormous amount" of staff quit in just one day.

91.    The demographics of David Burke Prime's potential customer base is another aggravating factor.  A large portion of David Burke Prime's customers have historically come from areas to its north and its east, including areas that are between David Burke Prime and

Double Barrel and areas north and east of Double Barrel. Many of the people in this demographic live closer to Double Barrel than they do to David Burke Prime. This enhances the likelihood of potential customer drain.

92.    So does the fact that many of the people in this demographic take I-95 south to come to Foxwoods or David Burke Prime. These people must literally pass Double Barrel, just off I-95, on their way to Foxwoods/David Burke Prime and on their way home.

93.    The circumstances, in sum, will show that the primary reason for the decline in David Burke Prime's performance after Double Barrel opened is the fact that Chef Burke/DB Global, along with the Preserve, opened a highly similar Burke-branded restaurant in the heart of David Burke Prime's customer base; blanketed David Burke Prime's potential customers with advertisements for Double Barrel, emphasizing its association with Chef Burke; and continue through the present to deliberately reinforce the public perception that Double Barrel is a Burke restaurant, sometimes by using his full name and sometimes in other ways, but, certainly, leaving any guest of Double Barrel with the impression that it is a Burke restaurant.

94.    The damage to David Burke Prime that Double Barrel has caused is ongoing, given that Plaintiffs intend to continue to operate David Burke Prime at Foxwoods for the long term (they have secured lease rights from Foxwoods through 2043). When ongoing damages and reputational injury are factored in, past and future damages exceed $10 million.

**Causes of Action**

**<u>As and for a First Cause of Action</u>**
*(Tortious Interference with Contract)*

95.    Plaintiffs incorporate each and every allegation set forth herein.

96.    Plaintiffs entered into a contract with Chef Burke that forbade him from allowing his name to be used for any restaurant located within 25 miles of Foxwoods.

97.     Defendant had knowledge of that contract yet deliberately induced Chef Burke to breach it by opening a restaurant with him that used his name at the Preserve, 19 miles from Foxwoods.

98.     As a direct result of the Preserve's interference with their contract rights, Plaintiffs have suffered substantial damage in an amount to be determined at trial, in excess of $10 million.  Plaintiffs are also entitled to punitive damages based on the Preserve's malicious, wanton misconduct.

### As and for a Second Cause of Action
*(Unjust Enrichment)*

99.     Plaintiffs incorporate each and every allegation set forth herein.

100.     In 2018, Chef Burke/DB Global conveyed to Plaintiffs their 50% ownership interest in David Burke Prime, including the goodwill associated with that restaurant.

101.     Both before and after the Settlement Agreement, Plaintiffs have invested heavily in developing and maintaining the goodwill associated with David Burke Prime.

102.     Through the actions described in this Complaint, the Preserve has improperly sought to divert to itself, at Plaintiffs' expense, the benefit of the goodwill that Plaintiffs have worked hard, and invested heavily, to develop and maintain for David Burke Prime.  Among other things, it has done this by opening Double Barrel less than 20 miles from David Burke Prime (in breach of a known contract between Plaintiffs and Chef Burke), using a confusingly similar trade name, falsely leading the public to believe that David Burke Prime and Double Barrel are the same restaurant or share the same ownership/management, targeting customers in the same geographical area as David Burke Prime (including by sending geolocated advertisements directly to customers who were already at Foxwoods), and serving a menu, at Double Barrel, that is highly similar to the menu at David Burke Prime.

103.    It would be against equity and good conscience to permit the Preserve to retain the profits it has generated through the improper use of David Burke Prime's goodwill.

**<u>As and for a Third Cause of Action</u>**
*(Injunction)*

104.    Plaintiffs incorporate each and every allegation set forth herein.

105.    The Settlement Agreement is a valid and binding contract that prohibits Chef Burke's name from being used in connection with any restaurant located within 25 miles of Foxwoods.

106.    The Preserve, with knowledge of the Settlement Agreement, has deliberately interfered with Plaintiffs' rights under the Settlement Agreement and continues to do so by using Chef Burke's name in connection with Double Barrel, which is just 19 miles from Foxwoods.

107.    The Preserve's use of Chef Burke's name in connection with a restaurant so close to David Burke Prime, in violation of Plaintiffs' rights under the Settlement Agreement, has caused and is causing ongoing damage to Plaintiffs.

108.    Plaintiffs – whose rights under the Settlement Agreement will continue indefinitely so long as they continue to operate David Burke Prime at Foxwoods, and who have secured the right to continue operating David Burke Prime at Foxwoods through at least 2043 – will be irreparably harmed in the event that the Preserve, at any time prior to the cessation of David Burke Prime operating, takes action that, in whole or in part, induces Chef Burke to breach his obligations under the Settlement Agreement.

109.    Plaintiffs' potential injuries, at least in part, are not likely to be fully compensable by an award of monetary damages.

110.    Taking all of the circumstances into account, the balance of the hardships favors a permanent remedy in equity.

111.    The public has an interest in permanent equitable relief, as it has an interest in not being misled by the types of unfair and confusing marketing tactics aimed at the public generally, in the recent past, by the Preserve and Chef Burke, and because it has an interest in the enforcement of agreements in accordance with their terms.

112.    Plaintiffs are entitled to an injunction prohibiting the Preserve from using Chef Burke's name in any way in connection with Double Barrel.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in favor of Plaintiffs as follows:

On the first cause of action, a money judgment against the Preserve in an amount to be determined at trial, but in no event less than $10 million, as well as punitive damages and attorneys' fees in an amount to be determined at trial;

on the second cause of action, a money judgment against the Preserve in an amount to be determined at trial, but in no event less than $10 million, as well as punitive damages and attorneys' fees in an amount to be determined at trial;

on the third cause of action, an injunction prohibiting the Preserve from using Chef Burke's name in any way in connection with Double Barrel; and

such other and further relief as to this Court may seem just and proper.

Dated: Providence, Rhode Island
        December 15, 2025

                            **PIERCE ATWOOD LLP**


                            By: /s/ Michael J. Daly___
                            Michael J. Daly
                            One Citizens Plaza
                            Providence, RI 02903
                            Tel: 401-490-3424
                            Fax: 401-588-5166